**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN TUCKER, | CASE NO. CV-F-09-1348 LJO DLB |
| Plaintiff, | **ORDER ON CROSS-SUMMARY JUDGMENT MOTIONS** (Docs. 22, 23) |
| vs. | |
| ALLSTATE INDEMNITY COMPANY, | |
| Defendant. | |

## INTRODUCTION

In this insurance coverage dispute, the parties present cross-summary judgment/adjudication motions, pursuant to Fed. R. Civ. P. 56. Plaintiff John Tucker ("Mr. Tucker") moves for summary judgment on his breach of contract and breach of implied covenant of good faith and fair dealing claims against defendant Allstate Indemnity Company ("Allstate"). Moreover, Mr. Tucker argues that he is entitled to an award of punitive damages as a matter of law. In its motion, Allstate moves for summary adjudication in its favor on Mr. Tucker's breach of good faith and fair dealing and punitive damages claims. This Court consolidated these motions into a uniform briefing schedule and found them suitable for a decision without a hearing. Having considered the parties arguments and the exhibits attached thereto, this Court DENIES Mr. Tucker's summary judgment motion in full and GRANTS in part and DENIES in part Allstate's summary adjudication motion. This Court grants judgment in favor of Allstate on Mr. Tucker's punitive damages request.

**BACKGROUND**

**Mr. Tucker's Claims**

Mr. Tucker initiated this action against Allstate based on Allstate's failure to pay Mr. Tucker for the total loss of his truck under his automobile insurance policy. In his complaint, originally filed in the Superior Court of California, County of Fresno, Mr. Tucker asserts causes of action against Allstate for: (1) breach of contract; and (2) breach of the implied covenant of good faith and fair dealing. The complaint requests "general, special, economic, and consequential damages," as well as punitive damages, attorneys fees, costs and prejudgment interest.

**Mr. Tucker's Summary Judgment Motion**

Mr. Tucker provides the following factual background to support his motion:

Mr. Tucker purchased automobile insurance for his 2007 GMC Sierra 1500 pickup Truck ("Truck"). The policy was issued by Allstate, Policy Number 627312634 ("the Policy"). The Policy provided coverage in the event of theft, loss and/or damage to Mr. Tucker's Truck.

Mr. Tucker added some after-market parts to his vehicle, including a tool/ladder system, a tool box, a breathing system, a complete stereo system, and an alarm system. He upgraded his Policy to include "ZA coverage," around August 21, 2007. The upgrade provided the additional coverage of his stereo system.

On September 20, 2007, Mr. Tucker returned home from work, parking his Truck in his driveway. He set the Truck alarm before entering his home. Mr. Tucker ate dinner and went to sleep. At around 4:15 a.m. the next morning, September 21, 2007, Mr. Tucker was notified by the police that his truck was stolen and burned in an area referred to as the "Westside of Fresno." Of the Westside, the police officer testified that "there's a lot going on in this particular area–gang activity, all type of things." The Fresno Police department concluded that Mr. Tucker's Truck was stolen and burned by an unknown suspect without Mr. Tucker's knowledge.

Mr. Tucker reported the loss to Allstate. Allstate conducted an investigation which required Mr. Tucker to comply with Allstate's requests for recorded statements and Examinations Under Oath. Mr. Tucker was the sole target of Allstate's investigation. Allstate found no evidence of wrongdoing by Mr. Tucker. For example, Allstate requested Mr. Tucker's phone records for the night in question, but found

1   that the only calls were from the police and to Allstate during the relevant times.  Despite this lack of

2   evidence, Allstate's investigation turned into a fishing expedition, as Allstate continued to look for ways

3   to blame Mr. Tucker for the loss of his Truck.

4          Allstate denied coverage of the loss of Mr. Tucker's Truck.  Allstate based their findings on the

5   facts that Mr. Tucker purchased GAP insurance to cover the rollover balance from a previous vehicle

6   and he purchased a replacement vehicle after learning from the police that his Truck was a "total loss."

7   Regarding the immediate purchase of a replacement vehicle, Allstate failed to give any deference to the

8   fact that the Truck was an instrumentality of Mr. Tucker's livelihood, as he is a handyman.  Moreover,

9   Allstate considered that Mr. Tucker would save $150 per month on the new truck he purchased after the

10  incident, despite the fact that Mr. Tucker was able to afford his monthly truck payments at all relevant

11  times.

12         Mr. Tucker is a law abiding citizen who has never been convicted of a crime.

13         Mr. Tucker argues that because Allstate had no factual basis to deny coverage under the Policy,

14  Allstate's denial of coverage was a bad faith attempt to avoid delivering on their promise of coverage.

15  Based on these other facts, Mr. Tucker argues that he is entitled to judgment as a matter of law on his

16  breach of contract, breach of good faith and fair dealing and punitive damages claims.

17                              **Allstate's Summary Adjudication Motion**

18         Allstate provides the following factual background to support its motion:

19                              **The Truck and Its Alleged Theft**

20         Mr. Tucker purchased a 2006 red Dodge truck in early 2006.  After a mechanical failure

21  destroyed that truck, Mr. Tucker purchased a 2007 Doge truck with no money down in September 2006.

22  Shortly thereafter, the new 2007 Dodge Truck started experiencing mechanical problems, which Mr.

23  Tucker believed were never repaired properly.  Consequently, Mr. Tucker traded in his 2007 Dodge

24  Truck for a 2007 GMC Sierra 1500 (the "Truck").

25         Mr. Tucker put no money down on the Truck, and owed $8,674.42 more on the 2007 Dodge

26  truck than its trade-in value. The Truck's purchase price was $28,538.83, but Mr. Tucker had to finance

27  over $42,000 to purchase it, because, among other things, he had to include the roll-over balance from

28  the 2007 Dodge.  Mr. Tucker's monthly payments on the Truck were $720.21.

1    When he purchased the Truck, Mr. Tucker received two sets of keys for it.  Mr. Tucker never

2 lost either key, made copies, or ordered additional keys.  No one other than Mr. Tucker drove the Truck

3 after he purchased it.

4    On September 20, 2007, Mr. Tucker parked the Truck in the driveway of his home and then

5 activated the Truck's alarm before going to bed that night.  Mr. Tucker contends that the Truck was

6 stolen between 10:00 p.m. on September 20, 2007 and 4:10 a.m. on September 21, 2007.  At 4:15 a.m.

7 on September 21, 2007, the police came to Mr. Tucker's home to inform him that the Truck had been

8 burned and was located on the westside of Fresno.

9                         **Mr. Tucker's Claim Raised Potential Fraud Indicators**

10    At the time of the alleged theft, Allstate insured the Truck under the Policy.  Like all standard

11 automobile policies, the Policy contains a "cooperative provision," requiring insureds to produce receipts

12 and other information and to appear for examinations under oath.  In addition, the Policy contained a

13 "Fraud and Concealment" clause, which provides as follows:

14    **Fraud**
     This policy will not apply to any claim in which an insured person has concealed or
15    misrepresented any material fact or circumstance.

16    On September 21, 2007, Mr. Tucker reported a claim to Allstate for the alleged theft and

17 destruction of the Truck.  Upon receipt of the claim, Allstate immediately arranged for a rental vehicle

18 for Mr. Tucker.  Allstate also commenced an investigation to determine the cause of the loss.

19    Allstate assigned the file to adjuster Ronnie Tuckett Lagade ("Ms. Lagade"), who contacted Mr.

20 Tucker the same day to obtain additional information about the claim.  Mr. Tucker confirmed that both

21 keys for the Truck were accounted for and in his possession at the time of the loss.

22    During Ms. Lagade's investigation, she discovered three indicators of potential fraud requiring

23 further investigation: (1) a change in policy coverage less than 90 days before the claim; (2) another fire

24 within the prior three years; and (3) a prior theft claim of another vehicle.  Because of the fraud

25 indicators, Ms. Lagade referred the claim to Allstate's Special Investigations Unit ("SIU").

26                                      **SIU Investigation**

27    On October 19, 2007, Allstate assigned the claim to Connie Wolf ("Ms. Wolf"), an SIU adjuster.

28 The SIU is a statutorily-mandate unit that specializes in the investigation of claims displaying potential

4

fraud indicators or "red flags." Ms. Wolf investigated each of the identified potential fraud indicators raised in Mr. Tucker's claim. Among other things, Ms. Wolf took Mr. Tucker's recorded statement.

During the course of her investigation, Ms. Wolf learned, among other things, that Mr. Tucker had already purchased a new 2008 GMC truck. As it turned out, Mr. Tucker had purchased the new vehicle the day after the Truck burned, and before he saw the Truck's damage. Ms. Wolf further learned that Mr. Tucker had a roll-over balance from his prior Dodge truck and that he had GAP insurance on the Truck. In addition, Ms. Wolf called the dealership where Mr. Tucker purchased the Truck and learned that the Truck had a factory-installed security system known as PassLock, which made it extremely difficult (if not impossible) to steal the Truck without a key.

On October 23, 2007, Ms. Wolf concluded that there was insufficient information to warrant further investigation and requested approval to transfer the file back to the claims office for payment to Mr. Tucker. Ms. Wolf made her request before she had seen the Truck's purchase agreement, a copy of which she requested from the claims office.

The next day, Ms. Wolf received a copy of the Truck's purchase agreement, which reflected the rollover balance from Mr. Tucker's prior Doge that became part of the financing of the Truck. She concluded that as a result of the Truck's being burned and Mr. Tucker's having GAP insurance, Mr. Tucker was able to purchase a newer vehicle (the 2008 GMC) with no rollover balance. This resulted in a lower monthly payment for Mr. Tucker. This information led Ms. Wolf to believe the claim warranted further investigation. Accordingly, Ms. Wolf requested and received approval to retain the file for further investigation.

**Allstate Retains Automotive Fire and Theft Forensic Expert**

On October 29, 2007, Allstate retained Lee S. Cole & Associates ("Lee Cole") to examine the Truck and to determine how it was driven away from Mr. Tucker's residence. Lee Cole is a company specializing in the forensic investigation of automobile fires and thefts. Lee Cole assigned Alex Wong ("Mr. Wong") to conduct the investigation. Mr. Wong is Lee Cole's most experienced automobile fire and theft forensic investigator and is currently the company's lead trainer in fire and theft investigations. Mr. Wong is educated and experienced in the field, and among other things, worked for General Motors where he was involved in the development of its PassLock theft prevention system.

1    After inspecting the Truck multiple times, Mr. Wong provided Allstate with a summary of his

2  findings and conclusions on November 14, 2007.  Mr. Wong reported that the ignition lock had external

3  cosmetic damage and was not compromised, that his forensic lock analysis concluded that the lock was

4  neither picked nor impressed, and that the Truck's transmission shift interlock mechanism was

5  functioning as designed.  In addition, Mr. Wong explained that the Truck was factory equipped with

6  PassLock II, a sophisticated security system that provides content theft protection and immobilize

7  protection if unwanted entry is detected.  Based on his observations, Mr. Wong concluded that the Truck

8  was last driven with one of the ignition keys.

9                                    **Allstate Retains Outside Coverage Counsel**

10    Based on Mr. Wong's conclusions, Ms. Wolf requested Mr. Tucker's examination under oath

11  ("EUO").  Allstate retained outside coverage counsel to conduct the EUO.  The EUO was conducted on

12  December 6, 2007.  The next day, Allstate's outside counsel provided a summary, explaining that Mr.

13  Tucker testified as follows:  Nick, a salesperson at Auto Sound Lab, told Mr. Tucker that an after-market

14  alarm system ("Clifford alarm") Mr. Tucker had installed in the Truck bypassed the Truck's factory

15  system and allowed the Truck to be operated without the key by using the Clifford alarm's remote

16  feature.  The outside counsel recommended to Allstate to investigate further Mr. Tucker's statement

17  about the Clifford alarm.

18    Mr. Wong inspected the Truck to determine whether the Clifford alarm had been installed.  Mr.

19  Wong also visited the Auto Sound Lab and spoke with the technician who installed the Clifford alarm

20  in the Truck.  The technician informed Mr. Wong that he would have installed the Clifford alarm

21  according to Clifford' recommendations.  Mr. Wong reported back to Ms. Wolf, and suggested further

22  questions to ask Mr. Tucker about the Clifford alarm.

23    A supplemental EUO was conducted on January 10, 2008 to ask Mr. Tucker the questions

24  suggested by Mr. Wong.  Mr. Tucker testified that he used the remote button every day and that he had

25  to put a key in the ignition to turn it before he drove the Truck.  Mr. Tucker further testified that if he

26  did not use the key, the Truck's engine would die.

27    Mr. Wong concluded, based on the supplemental EUO and further discussions with the Auto Lab

28  technician, that the Clifford alarm was installed correctly and that there was no way that the PassLock

1  alarm system was bypassed and the Truck was driven away without the use of the ignition key.  Mr.

2  Wong further concluded that even if the alarm was not activated, the PassLock system would have

3  provided the immobilizer protection.

4  **Allstate Denies Coverage**

5  In a February 6, 2008 coverage opinion, Allstate's outside coverage counsel recommended that

6  Allstate deny Mr. Tucker's claim for material misrepresentations and failure to cooperate.  Counsel

7  advised Allstate as follows, in pertinent part:

8   It is our opinion, based on the totality of the circumstances, that Mr. Tucker
    misrepresented and concealed facts during the investigation of this matter.  The
9   testimony of Mr. Tucker along with the interviews of Mr. Ellis and John and findings by
    Mr. Wong establish that if the alarm was set as Mr. Tucker said it was, the vehicle was
10  more likely than not driven to the recovery site using one of the two keys that were in
    Mr. Tucker's possession and control.  Thus, at a minimum, evidence establishes that Mr.
11  Tucker had misrepresented facts about his keys to the vehicle and his knowledge about
    who burned the vehicle.  There is other circumstantial evidence which supports this
12  conclusion, including his purchase of ZA coverage shortly before the loss, his testimony
    that gasoline was the cause of the fire and his purchase of a new vehicle the next day
13  before he had even seen the recovered vehicle (which indicates that he knew the vehicle
    could not be repaired).  He also had a motive to dispose of the vehicle in light of the
14  deficiency that was financed from his prior vehicle.  In the end, he ended up with the
    2008 version of the same vehicle with a much lower monthly payment.
15
    In our opinion, this conduct clearly impaired Allstate's ability to conduct a thorough
16  investigation and learn the true facts surrounding this loss.  Thus, in our opinion, Mr.
    Tucker has not provided Allstate with adequate and sufficient information in order to
17  fully process and investigate this claim.

18  Therefore, we recommend that coverage for this claim be denied in its entirely based on
    the application of the "Fraud" provision and the implied cooperation clause.
19

20  Allstate denied coverage for Mr. Tucker's claim in a February 13, 2008 letter.

21  **Procedural History**

22  On September 29, 2010, Mr. Tucker moved for summary judgment in his favor on all of his

23  claims.  On the same day, Allstate moved for summary adjudication of Mr. Tucker's good faith and fair

24  dealing and punitive damages claims. Each party set a different hearing date.  This Court consolidated

25  the motions and set a uniform briefing schedule.  The parties filed oppositions on October 14, 2010.

26  Having considered the parties' arguments and exhibits attached thereto, this Court found this motion

27  suitable for a decision without replies or a hearing, and issues the following order.

28  ///

1

**STANDARD OF REVIEW**

2          On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to

3    any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

4    (1970). A party seeking summary judgment/adjudication bears the initial burden of establishing the

5    absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

6    moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential

7    element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make

8    a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and

9    on which the non-moving party bears the burden of proof at trial. *Id*. at 322. "The judgment sought

10   should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits

11   show that there is no genuine issue as to any material fact and that the movant is entitled to judgment

12   as a matter of law." Fed. R. Civ. P. 56(c). "If the party moving for summary judgment meets its initial

13   burden of identifying for the court those portions of the material on file that it believes demonstrates the

14   absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party

15   must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v.*

16   *Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting Fed. R. Civ. P. 56(e)).

17         To establish the existence of a factual dispute, the opposing party need not establish a material

18   issue of fact conclusively in its favor, but "must do more than simply show that there is some

19   metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. It is sufficient that "the

20   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of

21   the truth at trial." *First National Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 290 (1968); *T.W.*

22   *Elec. Serv.*, 809 F.2d at 631. The nonmoving party must "go beyond the pleadings and by her own

23   affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts

24   showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Fed. R. Civ. P. 56(e) requires

25   a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for

26   trial." "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine

27   issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et*

28   *al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

1   With these standards in mind, the Court turns to the parties' arguments.

2                                        DISCUSSION

3                                   **Breach of Contract**

4       Though it is unclear from his motion, the Court presumes that in the first section of his argument,

5   Mr. Tucker moves for summary adjudication on his breach of contract claim.  Without identifying the

6   cause of action, or setting forth any law to support his lengthy argument, Mr. Tucker's argument is

7   summarized as follows: "The ultimate outcome determinative fact in this case is obvious, PLAINTIFF,

8   Mr. Tucker, did not cause and was not involved in the theft and burning down of his own truck and

9   despite obvious inability to establish evidence indicating otherwise, DEFENDANT chose to deny the

10  PLAINTIFF's claim." Pl. Memo., 4.  Mr. Tucker argues that summary judgment should be granted in

11  his favor because Allstate's evidence "is merely colorable and not significantly probative." *Id*.  Mr.

12  Tucker contends that the "pleadings, depositions, declarations attached hereto as well as other evidence

13  on file make it obvious that DEFENDANT has failed to establish any wrongdoing on the party of

14  PLAINTIFF and that their denial of coverage is in bad faith." *Id*.  Mr. Tucker relies on a police

15  investigation that concluded that an "unknown suspect took the vehicle without the owner's consent."

16  Pl. Memo., 5.  Mr. Tucker dismisses Allstate's evidence out of hand, characterizing Allstate's forensic

17  evidence as "incomplete" and "partial." *Id*. Mr. Tucker challenges the veracity of Allstate's evidence,

18  arguing that all of the experts and employees that worked on this case acted only in the interest of

19  Allstate. *Id*. at 6-8.  Mr. Tucker claims that Allstate has "failed to show even a scintilla of evidence

20  proving that PLAINTIFF assisted in stealing and burning his own Truck." Pl. Memo., 5.  Mr. Tucker

21  concludes that through these arguments–unsupported legally or factually– he has established Allstate's

22  "failure to offer any evidence of his wrongdoing other than [its] presumptions based on common

23  occurrences...that is not evidence of wrongdoing, that is typical consumer behavior." *Id*. at 8.

24      Mr. Tucker has failed to satisfy his burden to demonstrate that he is entitled to judgment as a

25  matter of law on this cause of action.  To establish a breach of contract under California law, Mr. Tucker

26  must prove the following: "(1) existence of the contract; (2) plaintiff's performance or excuse for

27  nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF*

28  *Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).  Mr. Tucker fails to discuss these

1    elements in his argument.  In addition, Mr. Tucker fails to address insurance law applicable to this

2    action.  Mr. Tucker's arguments may be appropriate for argument in front of a jury, but have no place

3    in a Fed. R. Civ. P. 56 motion.

4            Questions of fact remain on this cause of action.  As the insured, Mr. Tucker must comply with

5    the Policy to receive benefits. *Brizuela v. CalFarm Ins. Co.*, 116 Cal. App. 4th 578, 587 (2004).  "'If the

6    insured cannot bring himself within the terms and conditions of the policy he cannot recover. The terms

7    of the policy constitute the measure of the insurer's liability. If it appears that the contract has been

8    violated, and thus terminated by the assured, he cannot recover. He seeks to recover by reason of a

9    contract, and he must show that he has complied with such contract on his part.'" *Id*. (quoting *Hickman*

10   *v. London Assurance Corp*., 184 Cal. 524, 534 (1920)).  According to the evidence, Allstate denied

11   coverage based on its conclusion that Mr. Tucker's failed to comply with the fraud provision and the

12   implied cooperation clause of the Policy.  Mr. Tucker fails to demonstrate that there are no questions

13   of fact as to whether he complied with the policy.  On the contrary, the evidence presented in the light

14   most favorable to the plaintiff still shows that it was reasonable for Allstate to conclude that Mr.

15   Tucker's claim was suspicious and that he failed to comply with the policy.  *See e.g., Abdelhamid v.*

16   *Fire Ins. Exch.*, 182 Cal. App. 4th 990, 1001 (2010) (upholding summary judgment of breach of contract

17   claim in insurer's favor where, *inter alia*,  it was reasonable to suspect insured's responsibility for a fire

18   where insured paid too much for the property, had been forced to carry multiple loans, made a change

19   in the insurance provisions shortly before the fire, and the evidence shows a lack of forced entry into the

20   house).

21           In addition, Mr. Tucker's assertions are unsupported.  Mr. Tucker submits that Mr. Wong

22   admitted that the Truck's PassLock alarm system did not require a key to operate the Truck.  To support

23   this assertion, Mr. Wong cites to pages 28-30 of Mr. Wong's deposition.  There are fatal problems with

24   this citation.  First, Mr. Tucker failed to submit the relevant portions of Mr. Wong's deposition as an

25   exhibit to his motion.  Instead, Mr. Tucker emailed electronic copies of full deposition transcripts to the

26   clerk of court. Local Rule 133(j) advises: "Neither hard copy nor electronic copy of the entire deposition

27   will become part of the official record of the action absent order of the Court.  Pertinent portions of the

28   deposition intended to become part of the official record shall be submitted as exhibits in support of a

10

1   motion or otherwise." Because Mr. Wong failed to submit the relevant portions of the Wong deposition,

2   Mr. Tucker's arguments relying on that deposition are unsupported. According to Fed. R. Civ. P. 56(e),

3   this Court may consider the fact that Truck's PassLock system required a key to be undisputed. Second,

4   although this Court had no obligation to do so, the Court looked at the referenced page numbers of the

5   Wong deposition. Pages 28-30 of the Wong deposition do not support Mr. Tucker's assertion. Mr.

6   Tucker cites to those pages to support the assertion that the Truck's PassLock alarm system did not

7   require the original key to be operated. In those pages, however, Mr. Wong describes documents on his

8   thumb drive, and explains a bypass unit on newer vehicles. His testimony explanation does not address

9   the use of a physical key to operate a vehicle and does not compare the bypass unit described with the

10  type that was on the Truck's PassLock system.

11          Moreover, Mr. Tucker fails to "invalidate all of" Allstate's arguments, as he claims. Mr. Tucker

12  asserts that because anyone can download the owner's manual to the Truck's after-market alarm system,

13  and Mr. Tucker testified that his after-market alarm system malfunctioned prior to the theft, he has

14  "completely refute[d] the only little theory they have used to say that DEFENDANT's own key must

15  have been used to bypass the system. At this point, all of DEFENDANTS arguments have been

16  invalidated." Pl. Memo., 6. Mr. Tucker's suggestion is unsupported by evidence and has little logical

17  connection to his conclusion. Even if all of Mr. Tucker's assertions were supported, his arguments still

18  raise questions of fact.

19          To recover on his claim, Mr. Tucker must do more than disagree with, dismiss, and/or ignore

20  Allstate's proffered evidence. Mr. Tucker has failed to do so. Mr. Tucker dismisses Allstate's

21  investigation, which he characterizes as a "fishing expedition"; however, where "the insurer has reason

22  to suspect arson...an insured is entitled to develop circumstantial evidence of the insured's involvement

23  in the suspected arson." *Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 1001 (2010). In addition,

24  Mr. Tucker refused to distinguish the difference between questions of fact and questions of law. In

25  contrast to Mr. Tucker, Allstate has satisfied its burden to go beyond the pleadings to demonstrate by

26  evidence that there are genuine issues of material fact as to whether Mr. Tucker performed under the

27  contract, and whether Allstate breached the contract. Accordingly, questions of fact remain on the

28  second and third elements of the breach of contract cause of action. *See Id.* at 999.

1          **Breach of Good Faith and Fair Dealing**

2          "There is an implied covenant of good faith and fair dealing in every contract that neither party

3    will do anything which will injure the right of the other to receive the benefits of the agreement."

4    *Communale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 659 (1958).  This principle applies to insurance

5    policies. *Id*.    To establish a breach of the implied covenant of good faith and fair dealing under

6    California law against an insurance company, a plaintiff must show: "(1) benefits due under the policy

7    were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause."

8    *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).

9          An "insurer's erroneous failure to pay benefits under a policy does not necessarily constitute bad

10   faith entitling the insured to recover tort damages." *Opsal v. United Services Auto. Ass'n.*, 2 Cal. App.

11   4th 1197, 1205 (1992).  "The ultimate test of bad faith liability in the first party cases is whether refusal

12   to pay policy benefits was unreasonable." *Id*. (quoting *Austero v. Nat. Cas. Co.*, 84 Cal. App. 3d 1, 32

13   (1978)).    "When benefits are due an insured, delayed payment based on inadequate or tardy

14   investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately

15   payable and numerous other tactics may breach the implied covenant because they frustrate the insured's

16   right to receive the benefits of the contract in prompt compensation for losses." *Waller v. Truck Ins.*

17   *Exch., Inc.*, 11 Cal. 4th 1, 36 (1995).  On the other hand, an insured is entitled to summary judgment on

18   a breach of good faith and fair dealing claim where it provides a rational basis–whether correct or not–to

19   question an insured's claim. *See Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000).

20         Mr. Tucker argues that he is entitled to judgment as a matter of law on this breach of good faith

21   and fair dealing claim.  Mr. Tucker argues that the defendants:

22         denied coverage knowing that they had no grounds to do so and knowing that there
            PLAINTIFF was not involved in any wrongdoing, they continued on a path of "fishing-
23         expedition" to find ways to deny his claim.  They never had concrete evidence of any
            wrongdoing at any given time...Since DEFENDANTS have no direct evidence of any
24         wrongdoing, this is a violation of the covenant of Good Faith and Fair Dealing that
            constitutes a Breach of Contract as a matter of law.

25

26   Pl. Memo., 9.  To support these conclusory assertions, Mr. Tucker argues that Allstate:

27         hired experts to determine whether the coverage be denied, and one of those experts
            those experts [sic] gave opinions without even having enough data to write a final report.
28         The other expert ([outside coverage counsel], an attorney), relied on an email of the first

                                                    12

1   expert (Mr. Wong) who did not have enough data to write a final report.
    DEFENDANTS used the advantages of their endless wealth to line up experts who were
2   willing to give opinions without having enough information to even write a report. All
    the PLAINTIFF got was a temporary rental when he was entitled to full coverage of his
3   loss that occurred due to theft, a covered loss.

4   Mr. Tucker concludes: "How can they rely on the advice of counsel that they knew that [outside

5   counsel's] advice was based on Mr. Wong's opinion, as discussed and referenced before and they further

6   knew that Mr. Wong had not even done enough testing at this point to be able to write a final report[?]"

7           To assert a claim for breach of the implied covenant of good faith and fair dealing, Mr. Tucker

8   must show that:

9           the conduct of the defendant, whether or not it also constitutes a breach of a consensual
            contract term, demonstrates a failure or refusal to discharge contractual responsibilities,
10          prompted not by an honest mistake, bad judgment or negligence but rather by a conscious
            and deliberate act, which unfairly frustrates the agreed common purposes and disappoints
11          the reasonable expectations of the other party thereby depriving that party of the benefits
            of the agreement.

12

13   *Chateau Chamberay Homeowners Assoc. v. Assoc. Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347-48 (2001).

14   "The mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on a legitimate

15   dispute as to the insurer's liability under California law, does not expose the insurer to bad faith

16   liability." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1280-81 (1994); *Nager v. Allstate*

17   *Ins. Co.*, 83 Cal. App. 4th 284, 288 (2000).  "The reasonableness of the insurer's decisions and actions

18   must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light

19   of subsequent events that may provide evidence of the insurer's errors." *Chateau Chamberay*, 90 Cal.

20   App. 4th at 347.

21          Mr. Tucker's bad faith argument focuses on Mr. Wong's admission that he did not prepare a final

22   report of his investigation for Allstate.  Mr. Tucker argues that Allstate's basis for its decision was thus

23   incomplete and unreliable. In Mr. Wong's deposition, the following exchange took place:

24          Q.    You mentioned a final report.  You usually prepare final reports, correct?
            A.    Yes.
25
            Q.    Why didn't you prepare one in this case?
26          A.    In my book, I always wait until everything is completed and I do it, and normally
                  I have been instructed to do the forensic epilogue.
27
            Q.    Epilogue.  You mean report?
28          A.    No.  Do a forensic analysis of the lock.

13

1    Q.    Oh, forgive me.  In this case, you were asked to do a report, correct?
     A.    No.

2
     Q.    Were you asked to do a report in this case?
3    A.    Possible, but I made the recommendation—

4    Q.    Why didn't you?
     A.    Because I did not get authorization to do the forensic analysis of the lock.

5
     Q.    Who asked you to prepare the report?
6    A.    I do not recollect.

7    Q.    Who did you ask to get authorization to prepare a report?

8                        [objections and discussion between attorneys ensues]

9    Q.    Did you say that you were asked to prepare a report?
     A.    I don't remember...If i was asked to prepare a report, I would have made the
10         recommendation that my investigation is not complete based on that I did not get
           authorization to perform the forensic analysis of the lock.

11
     Q.    Did you ever complete your investigation to the point you would be able to
12         prepare a report in connection with this case?
     A.    No.

13
     Q.    Why not?
14   A.    They key evidence is the lock.  That I need to complete.

15   Q.    When did you get the lock?
     A.    I got the lock on my second visit, I believe.

16
     Q.    So it was 2007.
17   A.    Around there.

18                                  [parties take break]

19   Dr. Wong:    I want to clarify a couple of things.  Normally, when I write the final
                  report, I want to make sure that I comprehensively document the whole
20                case, and if you look at the assignment that I got, it was–the key evidence
                  was the lock.  I got that assignment, and I got all of that, and as you see,
21                the focus went to the DEI, so I really did not able to capture the exact
                  scope of the whole assignment to finish the final report.

22

23        Arguably, this deposition testimony supports Mr. Tucker's position that Allstate's denial of his

24   claim was unreasonable.  Mr. Wong explained that he did not write the final report because Allstate did

25   not request a final report, which was unique.  Mr. Wong admitted that without examination of the lock,

26   his investigation was incomplete, and that they lock was the "key evidence" in this case.   Mr. Tucker

27   argues that Mr. Wong's incomplete investigation is significant, because Allstate's outside counsel, in

28   turn, relied on the incomplete recommendations of Mr. Wong in its opinion letter that led Ms. Wolf to

                                            14

1    recommend denial of benefits to Mr. Tucker.  The evidence may support Mr. Tucker's position that

2    reliance on Mr. Wong's incomplete, preliminary report was unreasonable.

3          Allstate counters that the evidence establishes that Allstate's reliance on Mr. Wong's preliminary

4    report was reasonable as a matter of law.  Mr. Wong based his recommendations, *inter alia*, on several

5    inspections of the Truck, his experience and knowledge of the PassLock system, his interviews with the

6    people who installed the after-market alarm system, and Mr. Tucker's responses to the questions Mr.

7    Wong suggested in a supplemental interview under oath.  In addition, Ms. Wolf's contemporaneous

8    notes indicate that when she received outside counsel's opinion to deny coverage, she called Mr. Wong

9    to inquire about his preliminary findings.  Ms. Wolf's notes indicate that Mr. Wong told her that his final

10   opinion would not differ from his preliminary opinion.  To address the testimony above, Allstate argues

11   that Mr. Wong confirmed that he would not have changed his conclusion about whether use of the key

12   was required to operate the Truck the evening it burned:

13        Q:     But with respect to the conclusion regarding the use of the key to take Mr.
                 Tucker's truck, was there anything that you needed that prevented you from
14               writing any final report on that matter.
          A.     No.  That's not needed.
15

16   Viewed in a light most favorable to Allstate, there is evidence to support Allstate's position that Ms.

17   Wolf's decision to recommend denying coverage based on Mr. Wong's preliminary report was

18   reasonable.  Because of Mr. Wong's experience with PassLock, Mr. Wong's conclusion that the Truck

19   could not be operated without a key, and the undisputed fact that only Mr. Tucker had possession of the

20   key, Ms. Wolf's reliance on Mr. Wong's recommendations may have been reasonable.  Thus, Allstate

21   has sustained its burden to establish a factual dispute on Mr. Tucker's breach of the covenant of implied

22   good faith and fair dealing claim.  Accordingly, Mr. Tucker's motion for summary judgment on this

23   claim is denied.

24         Allstate also moves for summary judgment on this claim in its favor.  Allstate argues that its

25   decision to deny Mr. Tucker's claim was reasonable, because: (1) it relied on the opinion of an

26   independent expert; (2) it relied on the opinion of outside coverage counsel; and (3) it is required by

27   California law to investigate and deny fraudulent claims.  Allstate argues that as an insurer, it is entitled

28   to summary judgment if there is a question of fact as to the insurer's liability on the breach of contract

1    claim. *Fraley*, 81 Cal. App. 4th at 1292 ("It is well established that bad faith liability cannot be imposed

2    where there exists a genuine issue as to the insurer's liability under California law."); *Lunsford v.*

3    *American Guarantee & Liability Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994) ("A court can conclude as

4    a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine

5    issue as to the insurer's liability."). Allstate contends that because it based its decision on the findings

6    of its investigation and opinions of its experts, it is entitled to judgment as a matter of law. An insurer's

7    denial is "not arbitrary" as a matter of law if it "investigated...the claim and based its refusal to defend

8    [or deny a claim] on that information and a reasonable construction of the policy." *Lunsford,* 18 F.3d

9    at 656.

10          To support the reasonableness of its decision to deny Mr. Tucker's claim, Allstate points to the

11   following evidence:  Allstate's investigation included two examinations of Mr. Tucker under oath,

12   numerous vehicle inspections by a qualified, retained expert, and interviews with persons at the car

13   dealership and those responsible for installation of the after-market security system. Allstate's retained

14   expert and outside counsel both concluded that the claim was fraudulent. *See Chateau Chamberay,* 90

15   Cal. App. 4th at 347-48 (an erroneous coverage denial does not give rise to bad faith liability if the

16   insurer reasonably relies on the opinions of outside professionals in making its decision). Moreover,

17   Allstate considered indicia of fraud including, *inter alia*, the following on which it based its denial of

18   coverage: (1) Mr. Tucker's recent history with burned vehicles; (2) Mr. Tucker's recent purchases of

19   vehicles; (3) Mr. Tucker's recent change of the insurance coverage; (4) Mr. Tucker's immediate

20   purchase of a newer vehicle; (5) Mr. Wong's expert opinion that the Truck could not be operated without

21   a key; and (6) the undisputed evidence that Mr. Tucker had sole possession of the only keys to the Truck.

22   Based on these circumstances, and its reliance on the opinions of the expert and its outside counsel,

23   Allstate concludes that its decision to deny coverage was reasonable as a matter of law.

24          "It is well established that bad faith liability cannot be imposed where there exists a genuine issue

25   as to the insurer's liability under California law." *Id*. Federal and California courts consistently rule that:

26          a court can conclude as a matter of law that an insurer's denial of a claim is not
             unreasonable, so long as there existed a genuine issue as to the insurer's liability. An
27           insurer is liable for breach of the implied covenant of good faith and fair dealing if it
             acted unreasonably in denying coverage.

28

1  *Guebara*, 237 F.3d  at 992 (quoting *Lunsford v. American Guarantee & Liability Ins. Co.*, 18 F.3d 653,

2  656 (9th Cir. 1994); *see also*, *Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217 (9th Cir. 1998)

3  (court can conclude as a matter of law that insurer's denial of claim is not unreasonable even if the court

4  concludes the claim is payable under policy terms, so long as there existed a genuine issue as to the

5  insurer's liability).  "A court can conclude as a matter  of law that an insurer's denial of a claim is not

6  unreasonable, so long as there existed a genuine issue as to the insurer's liability." *Chateau Chamberay*,

7  90 Cal. App. 4th at 347.

8         The "genuine dispute" doctrine may be applied where the insurer denies a claim based on the

9  opinions of experts. *Fraley,* 81 Cal. App. 4th at 1292.  Reliance on the expert's opinion, however, must

10  have been reasonable.  *Id*.  The reasonableness of an insurer's claims-handling conduct is ordinarily a

11  question of fact. *Chateau Chamberay*, 90 Cal. App. 4th at 347.  The question of reasonableness

12  "becomes a question of law where the evidence is undisputed and only one reasonable inference can be

13  drawn from the evidence." *Id*. (citing *Paulfrey v. Blue Chip Stamps,*150 Cal. App. 3d 187, 196 (1983)).

14  Here, the underlying facts are disputed, the evidence is disputed, the integrity of the investigation is

15  questioned, and inferences can be drawn in favor of both Mr. Tucker and Allstate, as set forth more fully

16  above and below.  Accordingly, questions of fact remain as to whether Allstate's reason for withholding

17  benefits was unreasonable or without proper cause.

18         Moreover, the cases upon which Allstate relies do not support its position that this Court can

19  determine the reasonableness issue as a matter of law in this action.  As explained in *Chateau*

20  *Chamberay,* 90 Cal. App. 4th at 348*, and *Guebara*, 237 F.3d at 996, a genuine dispute over an insurer's

21  coverage liability generally involves legal, rather than factual disputes.  Where, as here, there is a dispute

22  as to the underlying facts, a trial court cannot determine as a matter of law whether such a dispute is

23  "genuine." *Chateau Chamberay*, 90 Cal. App. 4th at 348 n. 7 ("Provided there is no dispute at the

24  *underlying* facts (e.g. what the parties did and said), then there trial court can determine, *as a matter of*

25  *law*, whether such dispute is "genuine".) (emphasis in original).  Mr. Tucker has submitted evidence to

26  dispute the underlying facts of this case.  He has submitted evidence that he was not involved with the

27  fire that destroyed his Truck.  Because the parties dispute the underlying facts, this Court cannot

28  determine this issue as a matter of law.

1    The factual issues presented in this action must be determined by a jury.  In *Guebara*, the court

2  explained that an expert's testimony will not automatically insulate an insurer from a bad faith claim.

3  The *Guebara* court suggested circumstances where a biased investigation claim should go to jury,

4  including, *inter alia*, when an insurer failed to conduct a thorough investigation. *Id.* at 996.  Here, Mr.

5  Tucker argues that Allstate failed to conduct a thorough investigation.  To support his assertion, Mr.

6  Tucker points to the above-cited transcript of Mr. Wong's testimony. Mr. Wong testified that he did not

7  complete his investigation because he was not authorized to examine the lock.  Mr. Wong further

8  testified that he believed that the lock was the "key evidence" to the investigation.  Viewed in a light

9  most favorable to Mr. Tucker, this evidence supports Mr. Tucker's inference that Allstate failed to

10  conduct a thorough investigation and Allstate's reliance on Mr. Wong's preliminary report was

11  unreasonable.  Under these circumstances, and as set forth in *Guebara*, 237 F.3d at 996, this Court

12  cannot determine whether Allstate's actions were reasonable as a matter of law.  Rather, genuine issues

13  of material fact remain as to whether Allstate's decision to deny benefits was reasonable.  Accordingly,

14  this Court denies Allstate's summary adjudication on this claim.

15                                                      **Punitive Damages**

16    Each party moves for summary judgment on Mr. Tucker's request for punitive damages.  Mr.

17  Tucker argues that he is entitled to punitive damages as a matter of law because Allstate ratified the

18  despicable conduct of Ms. Wolf.  Mr. Tucker does not specify the conduct of Ms. Wolf that he

19  characterizes as despicable.  Allstate argues that in no event is Mr. Tucker entitled to punitive damages,

20  because there was no malice or despicable conduct, and Allstate had no actual knowledge of the acts of

21  its employee.  For the following reasons, this Court agrees with Allstate.

22    California Civil Code section 3294(a) provides:

23       In an action for the breach of an obligation not arising from contract, where it is proven
         by clear and convincing evidence that the defendant has been guilty of oppression, fraud,
24       or malice, the plaintiff, in addition to the actual damages, may recover damages for the
         sake of example and by way of punishing the defendant.

25

26  Pursuant to this statute, Mr. Tucker bears the burden to establish the following to recover punitive

27  damages from Allstate: (1) the breach did not arise from a contractual obligation; (2) Allstate acted with

28  oppression, fraud, or malice, proven by clear and convincing evidence.

1    Mr. Tucker fails to identify the alleged conduct that was oppressive, malicious, or despicable.

2  "Malice" means that a corporation or agent of a corporation acted with intent to cause injury or that the

3  conduct was despicable and was done with a willful and knowing disregard of the rights or safety of

4  another. A person acts with knowing disregard when he or she is aware of the probable consequences

5  of his or her conduct and deliberately fails to avoid these consequences. "Oppression" means that the

6  conduct was despicable and subjected one or more plaintiffs to cruel and unjust hardship in knowing

7  disregard to his or her rights. "Despicable conduct" is conduct that is so vile, base, or contemptible that

8  it would be looked down on and despised by reasonable people. Mr. Tucker fails to set forth facts that

9  indicate by clear and convincing evidence that Ms. Wolf's actions fit within any of these definitions.

10    Allstate establishes that Mr. Tucker's punitive damages claim fails as a matter of law. "[T]he

11  conduct required to award punitive damages for the tortious breach of contract . . . is of a different

12  dimension [than that required to find bad faith]." *Shade Foods, Inc. v. Innovative Prods. Sales &*

13  *Marketing*, 78 Cal. App. 4th 874, 890 (2000). Even bad faith conduct does not rise to the level of

14  punitive damages, which requires a "distinct and far more stringent standard." *Id.*; *Silberg v. Cal. Life*

15  *Ins. Co.*, 11 Cal. 3d 452, 462-63 (1974). Mr. Tucker has failed to set forth evidence to demonstrate that

16  Allstate, or its agent Ms. Wolf, acted with malice, oppression or fraud. Ms. Wolf, an Allstate SIU

17  investigator conducted an investigation into Mr. Tucker's claim of his burned Truck. Mr. Tucker

18  characterizes the investigation as a "fishing expedition," but fails to consider that under California law,

19  if "the insurer has reason to suspect arson...an insured is entitled to develop circumstantial evidence of

20  the insured's involvement in the suspected arson." *Abdelhamid*, 182 Cal. App. 4th at 1001. In addition,

21  Allstate is required by California statute to investigate suspicious claims under anti-insurance fraud

22  legislation. *See* 10 Cal. Code Regs. §§2698.30, 2698.32. Ms. Wolf based her recommendation on the

23  opinions of a forensic expert and outside coverage counsel. Even if that reliance was unreasonable or

24  erroneous, there is no "clear and convincing" evidence that she was aware that she was infringing on Mr.

25  Tucker's rights, and made a conscious decision to disregard those rights. Moreover, there is no

26  evidence that Allstate had actual knowledge of Ms. Wolf's conduct, as required by the statute.

27  California Civil Code section 3294(b). "[A] central theme to those cases which have sustained punitive

28  awards is the existence of established policies or practices in claims handling which are harmful to

1  insureds." *Mock v. Michigan Millers Mut. Ins. Co.*, 4 Cal. App. 4th 306, 331 (1992).  Allstate

2  successfully demonstrates an absence of evidence to support Mr. Tucker's punitive damages claim.

3                                   CONCLUSION

4       For the foregoing reasons, this Court:

5       1.    DENIES in full Mr. Tucker's summary judgment motion;

6       2.    DENIES Allstate's summary adjudication motion as to Mr. Tucker's second cause of

7             action for breach of good faith and fair dealing; and

8       3.    GRANTS Allstate's summary adjudication motion as to Mr. Tucker's punitive damages

9             request.

10

11      IT IS SO ORDERED.

12  **Dated:    October 15, 2010**              **/s/ Lawrence J. O'Neill**
                                          UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28